Good morning. May it please the court, counsel. I'm Camille Knight, counsel for Appellant Viju Mathew. In this case, the appellant contends that the restitution order was improper as to Mr. Mathew. This court has consistently held that the scope of restitution is limited by the scope of the indictment, both temporal and otherwise. This is because the purpose of restitution, of course, is to compensate victims and not for punishment. This court has consistently said that restitution cannot be awarded for losses attributable to conduct outside the temporal scheme charged. The same is true for conduct not charged as part of the scheme. That's De Leon, 728 F. 3rd at 507, citing Sharma. Here, though, the government suggests that the court simply do away with well-settled precedent that limits restitution to conduct alleged in the indictment, because while restitution can be awarded when a scheme is alleged in the indictment for actions pursuant to the alleged scheme or when the parties agree to enlarge the scope of restitution in a plea agreement, neither of the situations is present here. The government indicted Mr. Mathew on aggravated identity theft pursuant to 18 U.S.C. 1028. There is no scheme, conspiracy, or pattern as an element of this offense. The government concedes that. The indictment alleges that on one date, September 23, 2011, Mr. Mathew possessed five or more authentication features, which were health insurance claim numbers. The factual resume properly sets forth the elements, which do not include a scheme or pattern in that case. There was no further agreement between the parties. I don't have a case for you involving an analysis of restitution solely for a conviction of 18 U.S.C. 1028, and neither does the government have a case that expands justifying this Court's precedent in cases where there is no scheme, pattern, or conspiracy alleged, because there isn't one. The government typically charges these cases as conspiracies to commit health care fraud. The government did here as to Mr. Mathew's spouse in the related case. Clearly, the government knows how to properly charge cases to attain restitution awards in schemes. It chose not to charge this case in a manner that would justify an expanded scope of restitution. Instead we're going to tell us what the restitution should be? Yes, Your Honor. Okay. Instead, the government urges you to turn the Court's precedent on its head and hold that precedent falls away when the government makes a charging decision declining to allege a scheme, but somehow urges a but-for causation standard to wipe all that precedent away. The government has offered no analysis to support this position. The government argues that Mr. Mathew's possession of the authentication features was direct and proximate cause of Medicare's loss. Even if, without conceding this point, the proximate prong of causation was shown, the government offers no support for the proposition that the direct prong of causation would be met by the mere possession of authentication features on one date. Counsel, he stole them to gain an economic benefit, didn't he? Isn't that true? Yes. He admitted that, that he possessed them to gain an economic benefit. Are you contesting that he did not get any economic benefit because the crime charged is simply a possession crime, or are you stating that the amount that was assessed was not appropriate because it, as I understood the argument, that it included amounts that Medicare before the date alleged in the indictment and admitted to the defendant? I think both of those things are correct, Judge Englehart. The court rejected the analysis in Monsias that mere possession involving future use of counterfeit securities was enough to find direct and proximate causation for restitution purposes. Also, the government has, as you have said, cited De León, both parties have cited De León, a case that has been analyzed by the court. Judge Smith, you have described De León as a case in which a district court erred in awarding restitution that exceeded the temporal scope of an actual scheme alleged in an indictment. You said that De León was, quote, a classic case of trying to expand beyond a plainly limited indictment. That was your dissenting opinion in Lozano. In both De León and Lozano, this court vacated restitution awards that included sums predating the temporal scope of the indictment. In Lozano, Judge Smith, you disagreed with the decision to vacate the award mainly based on the plain error standard of review in that case. In this matter, the standard of review is de novo. There is no question that the restitution award in this case included sums that predated September 2011 and included sums in 2010 and early 2011. The district court undertook a commendable effort, as it did in De León, over the course of 16 hours and four days and multiple briefings, rounds of briefing, to determine loss and restitution. But at the end of the day, the district court noted that there was a, quote, very tenuous connection between the government's offered proof and the restitution figure being sought by the government in this case. It also set forth this court's standard, which is the MVRA authorizes restitution that is directly and proximately caused by a defendant's offense of conviction, but limited to the actual loss caused by the offense of conviction. And moreover, the district court found that the government did not show, by a preponderance of the evidence, a conspiracy to commit health care fraud. So in short, there was no scheme alleged. There was no scheme proven. There was restitution awarded outside the temporal scope. There was no meeting of the minds or plea papers indicating that the parties agreed to expand restitution. And it is this case's de novo in contrast to Lozano. Counsel, you said earlier there's, the government concedes there's no scheme involved here. Does the government also concede that there's no, there was no meeting of the minds regarding expanding the temporal scope? I don't think the government has conceded that in their briefing. But this case, Judge Duncan, has a lot of bad facts. If you read the timeline, it was unusual and in Texas we would call it snake bit. So I don't think there was a meeting of the minds on pretty much anything during the duration of the case. And perhaps counsel for the government will disagree. I can obviously ask the government that too. I was just wondering if there were any arguments that you wanted to throw out with respect to meeting of the minds that you thought we needed to know about? No, other than we preserved the issue for appeal properly. And so the standard of review is different than other cases. And if there are no more questions, I will yield the rest of my time. Yes, you've saved time for rebuttal. Thank you. Thank you. Well, actually, you, Judge Smith, asked a question about whether you're going to tell us which, did you ask that question? You were going to tell us about the restitution. Did you want to address that? I think that's a finding that requires reversal to be sent back to make findings by the district court. But clearly, the amounts predating September 23, 2011 are incorrect. And there may be other amounts that were improperly included. And that may be addressed on remand. Okay, thanks. Thank you. Thank you, Ms. Knight. Ms. Williams. May it please the Court, Christina Williams for the government. Appellant asks this Court to disregard the district court's detailed factual findings after four days of evidentiary hearing solely focused on the issue of restitution. However, this Court should affirm the district court's restitution award for three reasons. First, the district court's restitution award was clearly limited to the offense of conviction. Second, there is ample evidence in the record to support the restitution amount as the amount directly and approximately caused by Matthew's identity theft. Third, Matthew failed to meet his burden of proving offsets. There is no error and certainly no abuse of discretion in the district court's restitution award. Do you disagree with the argument regarding cutting off restitution at September 2011? Yes, Your Honor. The government contends that the standard under the Mandatory Victims Restitution Act has been met here, that the restitution award was clearly linked to the direct and proximate cause of the offense of conviction. And as counsel noted, the That would be true if there were some kind of a conspiracy charge or some charge of an overall scheme, but I'm sure you acknowledge that there is none here. Yes, Your Honor. The district court found that there was no health care fraud scheme here. However, the language of the indictment itself, we believe, is not limited necessarily to September 23, 2011. The indictment states, on or about September 23, 2011, Matthew did knowingly possess with the intent to use unlawfully or transfer unlawfully these five or more health care numbers. That's record at 17. And possession is not necessarily limited to that specific date. You know, certainly Is there anything in the factual basis? I think I, sorry to interrupt your sentence, but my question is pertinent to what I think you were about to say. Is there anything in the factual basis or any other document in the record that suggests that the defendant's possession of this information predated or had been used prior to the September 2011 date? Yes, Your Honor. There's tremendous evidence in the record to that effect. First, there are copies of the printouts that Mr. Matthew took from Parkland that has all of the patient identities as well as his handwritten notes with over 1,300 names. And the date on the bottom of those is time stamped before the indictment. They're dated in 2010 and 2011. And that's at record 28-24-39. We also have witness statements of Dallas Home Health employees in the record noting Mr. Matthew's conduct ranging from 2009 to the date of the indictment that as early as 2009, Matthew had possession of these lists from Parkland that he then took to his home health care company employees, directed them to solicit the individuals, sign these individuals up. We know of at least 16 of those, and that's what the restitution award is based on. And those statements are at record 28-20-23. And then finally, completing the causal link, we have the Medicare bill showing the amounts billed by Dallas Home Health Care for these specific individuals and the dates on which they were billed, the date on which Medicare was paid. So the causal link is continued all the way through in the record evidence to show that these identities were possessed as early as 2009 and that he had intended. In fact, Mr. Matthew admits in his factual resume that he took these with the intent for economic gain and that then these were billed to Medicare and certainly he appreciated economic gain by Medicare paying these claims. So I think there's ample evidence in the record. And the district court certainly knew what the standard was for restitution that's recited in the sentencing transcript from the district court. So there's ample evidence to suggest and to prove, as the district court found, that those amounts, that $311,000, was the direct and the proximate cause of that offense of his identity theft with the intent to use him unlawfully. And the PSR classifies those 16 stolen identities. We focus on the 16 because there's the direct link through the evidence from those, that information from Parkland then billed out as Dallas Home Health patients and that payments were made between 2009 and 2013. Certainly it would be cleaner if the indictment, you know, stated an exact range. I was going to ask, in light of what you just said, and naturally we'll check the record and verify all that, why was he charged, why was there this specification on or about September 23, 2011 in the indictment? That was the date the warrant was conducted and although we had a tip earlier in 2011 and had been gathering information and, you know, had this idea that this was going on, the warrant was actually executed on that date and so there was concrete proof in the form of those patient lists on September 23 when the warrant was executed. All right. I see. Thanks. Were the 16 individuals that you just referenced, those qualified for Medicare anyway? Is the issue that they wound up with DHH but that they qualified, they were otherwise qualified or that they were not qualified at all? How does the number break down amongst those that are not qualified at all? Sure. That's an excellent question, Your Honor. And the, you know, there's a two prong test that we look at to determine, and this gets to their burden to prove the offsets they were entitled to. First, whether those were legitimate services that were being charged for and second, whether the government would have paid, Medicare would have paid but for the theft. And there's problems on both of those prongs. The first issue, Matthew simply did not meet his burden of proving that those were legitimate services. There's evidence in the record from Medicare stating that they have a process of flagging entities that submit claims where they know there's identity theft and that if they would have known there was identity theft, they would have never paid those claims. They would have shut that provider off entirely and that's not rebutted by Mr. Matthew. There's also evidence in the record in the form of interviews of these patients and the agent goes out there and sees, for instance, that someone is mowing their yard, therefore they're not homebound and they could have driven to get health care, not meeting the basic prerequisites under Medicare. And Matthew attempted to put forth evidence in the form of nurse testimony about the conditions of these individuals to establish that they were homebound and therefore were entitled to services. However, the Medicare regulations require that a doctor certify that. So the district court correctly found that was not competent evidence and that Matthew did not return to proving that these were legitimate Medicare services. Counsel, Ms. Knight argued that the government concedes there was no scheme charged here. Do you agree with that? There was no scheme? Yes, Your Honor. The plain language of the indictment does not include a scheme. Gotcha. Now, the second point that I asked her about was whether the government wants to argue that there was some kind of meeting of the minds with the defendant here that would expand the possible temporal scope of restitution. Is that an argument the government's making? Well, Ms. Knight is correct that there was no plea agreement in the case and that the case law from this court dictates that a plea agreement could be used to expand the amount of restitution. There is some suggestion in the rearrangement hearing where Matthew acknowledges that he could have restitution wider, but that's never reduced to a plea agreement, Your Honor. So in your view, that's not sufficient? You're not making the argument that that was sufficient to expand the possible scope of restitution? If the court wants to go there, the government would be happy. I'm just asking if you're arguing that. No, Your Honor. So turning back to what, again, this ample record evidence shows, you know, the government has met the test of proving that the restitution was limited to losses directly and proximately caused by the offense of conviction. We can look to N. Ray Fisher, 640 F. 3rd at 648 from this court in 2011 to provide guidance as to what exactly direct and proximate means. And direct means the but-for cause of the harm. The record shows that of the approximately 1,300 Parkland identities stolen by Matthew, 16 became patients of Dallas Home Health and were ultimately billed out. And Medicare paid Dallas Home Health over $311,000 for claims for those 16 patients. That's in the record at 2794. And this court has held that the PSR is generally considered reliable for sentencing purposes so long as it is not based on the bare assertions. That's most recently espoused from this court in United States v. Yucca-Zanama in 2018, U.S. App Lexus 33400 issued by the court on November 28, citing U.S. v. Hearns. And that's certainly, you know, there's much more evidence in the record here from a four-day sentencing hearing and in all of the exhibits submitted. These are not just bare assertions, a number, you know, out of the air speculating what that is. And, you know, I think it's clear that but-for Matthew's identity theft from Parkland, none of these 16 would have become patients of Dallas Home Health. And Medicare would have never have paid for home health care services for these individuals. There's ample testimony as to how they were solicited. There were gift cards given to some of these individuals signed up. There were extraneous things outside of, you know, even simple nursing tasks that were provided that certainly didn't rise to the level of skilled nursing. And second, the case law tells us that approximate means reasonably foreseeable. And Matthew admitted in his factual resume that he, number one, he admitted that he stole the patient identities from Parkland to solicit patients for Dallas Home Health. He admitted that he, quote, intended to use information to gain an economic benefit. And he admitted that he instructed his employees to solicit prospective patients on his behalf. Certainly, the reasonably foreseeable consequence of possessing stolen identities with the intent to gain economic benefit would be making money on them as Mr. Matthew did here. So, you know, both prongs of the direct and proximate cause have been met here. And the district court's award of restitution was certainly reasonable in light of these significant record evidence supporting the PSR's estimate of loss. And turning to the government's final issue, as I mentioned earlier, the district court correctly rejected Matthew's request for offsets. Matthew bore the burden of proving any offsets against loss. And case law is clear here. We can look to United States v. Mahmoud at 820F3rd at 194 in 2016. A defendant arguing for credit against loss must prove two things. The services provided were legitimate, and Medicare would have paid for those services, but for his fraud. And again, in United States v. Yugen as Economa here recently, the court reiterated that standard. And the district court, after hearing four days of testimony, correctly found that Matthew did not meet that burden and failed to show that Dallas Home Health provided legitimate Medicare reimbursable services. I mentioned earlier that there's testimony in the record from Medicare as to the fact that Medicare will flag claims where they know an entity has stolen identities. That can be found at records 623 to 625. And Matthew never rebutted this. This case is easily distinguished from Mahmoud, although we pull the case law and applicable standards from Mahmoud. In Mahmoud, legitimate services were actually provided to Medicare beneficiaries. There was no real debate there that the patients came to the hospital, qualified for Medicare, received medical care. The fraud there occurred later when the diagnosis codes were altered to increase the amount of Medicare funds. It was an upcoding case. And the court in Mahmoud found that because the fraud occurred after the fact, Mahmoud was able to show that In other words, there was a base level that Medicare should have rightfully compensated that hospital for, and Mahmoud just added extra to the top that could be taken as a restitution award. Matthew did not show the same here. There's no evidence any of the 16 would have chosen home health care services without Matthew's solicitation. There's no rebuttal to Medicare's witnesses' testimony that Medicare would not have flagged them as compromised identity. And finally, the district court found there was no concrete evidence of market value of services. Matthew was unable to prove, you know, let's say that he provided $100,000 of services that Medicare should have compensated or received benefit for, and that should be deducted. That simply didn't happen here. And in conclusion, the court has a conviction, which is the theft of those identities. The government affirms, urges the court to affirm the district court's judgment, including the restitution award. And if the court has no further questions, I'm happy to yield my time. All right. Thank you, Ms. Williams. Ms. Knight, you've saved time for a bottle. The government urges the government, going back to at least the early 90s in cases like Mancius, 1999, Adams, Arledge, Ashford, Inman, Hebron, Klein, Maturin, Jones, Sharma, Echols, Cawthorne, and Stouffer, all of which were on record before the government indicted this case and chose to limit the temporal scope of the indictment and not allege a scheme. Now, the case was indicted on July 24th, 2013. This court issued the De Leon opinion in August of that year. The government had ample time to supersede if it wanted to allege a scheme and include dates that predated July 23rd, 2011. And again, I urge the court that based on the facts of this case, it would not You mean September, right? You mean September 23rd, 2011? Yes. I'm sorry. September. Thank you. Based on the facts of this case, we urge the court not to overrule years of its precedent because of this issue that was of the government's choosing. As to the loss amount, the government bore the burden of proving loss in the first instance. I think that the standard it urges the court to adopt for loss amount shifts the burden improperly by stating that a defendant has to show that patients are qualified for home health care services in this case. Many of the patients in this matter, by the time the case was brought, by the time the factual resume was filed, and certainly by the time of the sentencing hearings, were deceased. And so it would be next to impossible for a defendant to prove that particular patients were entitled to home health care or were homebound or otherwise in the mine run health care conspiracy case in the future. Finally, Your Honor, Your Honors, if there was any evidence of a meeting of the mines between the parties to expand restitution, the court would certainly have it. There was not. And we ask the court to vacate the restitution award and remand for resentencing. Thank you. Thank you, Ms. Knight. Your case is under submission and we notice that you're court appointed. We wish to thank you for your willingness to take the appointment for your good work on behalf of your client and hope that you'll be willing to take future appointments. Certainly. Thank you for the opportunity. Next case, Fishback.